946 So.2d 376 (2006)
Kirby TATE a/k/a Kirby Glenn Tate, Appellant
v.
STATE of Mississippi, Appellee.
No. 2004-KA-00789-COA.
Court of Appeals of Mississippi.
April 4, 2006.
Rehearing Denied September 26, 2006.
Certiorari Denied January 11, 2007.
*378 J. Niles McNeel, Louisville, attorney for appellant.
Office of The Attorney General by Jeffrey A. Klingfuss, attorney for appellee.
Before LEE, P.J., IRVING and CHANDLER, JJ.
CHANDLER, J., for the Court.
¶ 1. Kirby Tate was convicted of Count I, possession of more than one ounce but less than one kilogram of marijuana with intent to sell, barter, transfer, distribute or dispense and of Count II, possession of three dosage units of Oxycodone, a schedule II controlled substance. Both counts were with enhanced sentencing because of Tate's habitual offender status and the fact of his prior convictions under the Mississippi Uniform Controlled Substances Act. *379 On Count I, Tate received a sixty year sentence and a $5,000 fine. On Count II, he received a sixteen year sentence and a $5,000 fine. The sentences were to run concurrently with each other and with Tate's prior sixty-year sentence for his conviction of possession and delivery of marijuana in the Lauderdale County Circuit Court. See Tate v. State, 912 So.2d 919 (Miss.2005). Both sentences were without the possibility of parole or early release.
¶ 2. On appeal, Tate raises the following issues:
I. THE COURT ERRED IN OVER-RULING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE.
II. THE COURT ERRED IN ALLOWING INTO EVIDENCE PRIOR FELONY CONVICTIONS OF THE DEFENDANT.
III. THE PROSECUTOR COMMITTED ERROR IN MAKING THE "SEND THE MESSAGE" ARGUMENT.
IV. THE SENTENCE OF SIXTY YEARS WITHOUT PAROLE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT VIOLATIVE OF THE UNITED STATES CONSTITUTION AND THE CONSTITUTION OF THE STATE OF MISSISSIPPI.
¶ 3. We find no error and affirm the judgment of the circuit court.

FACTS
¶ 4. At approximately 2:14 p.m. on June 20, 2003, Officer James Ramsey, a City of Meridian police officer, used his radar gun to clock Tate driving forty-five miles per hour in a thirty mile per hour zone on 65th Avenue in Meridian. Tate was driving a small pickup truck with a built-in refrigeration unit on the back. Officer Ramsey began following Tate and signaled for him to pull over. Tate parked in a restaurant parking lot at the intersection of 65th Avenue and 8th Street. Officer Ramsey stopped his patrol car behind Tate's truck. Officer Ramsey noticed that the truck had a broken brake light and that Tate had not been wearing his seat belt. Officer Ramsey called dispatch, communicated that he was conducting a traffic stop, and gave them the truck's tag number.
¶ 5. Tate exited the truck and approached the driver's side of the patrol car. He was wearing shorts and an untucked T-shirt. Officer Ramsey exited the patrol car and informed Tate that he had been driving forty-five miles per hour in a thirty mile per hour zone and that he had a brake light out. He requested Tate's driver's license and proof of insurance. Tate returned to his truck and produced a proof of insurance card, which Officer Ramsey examined. Officer Ramsey discovered that the proof of insurance was expired. Tate explained that the truck was insured, but that the proof of insurance was in another vehicle. At approximately 2:19 p.m., Tate offered to look further in the truck for proof of insurance. Tate got back inside his truck and sat in the driver's seat. Officer Ramsey returned to the patrol car to await Tate's proof of insurance and to write the traffic citations.
¶ 6. The dispatcher requested that Officer Ramsey call in, and Officer Ramsey did so at approximately 2:21 p.m. The dispatcher told Officer Ramsey that Tate was a semi-pro boxer and to be careful because Tate was "bad about sucker punching." Officer Ramsey requested that Officer Ron Payton come to the scene for backup. At some point, the dispatcher stated that the East Mississippi Drug Task Force was on their way to the scene. At approximately *380 2:24 p.m., Officer Ramsey returned to Tate's truck and asked Tate for his vehicle registration. Then, Officer Payton arrived, followed by Officer Artis Johnson. Officer Ramsey stated, "Something ain't quite right here. He may be 1055-other. Task Force just called and he has hidden compartments and is a known transporter. They are on their way right now."
¶ 7. At the suppression hearing, Officer Ramsey testified that "1055-other" means that a suspect is intoxicated with a substance other than alcohol. Officer Ramsey testified at the suppression hearing that he had not smelled alcohol on Tate, but Tate seemed very jumpy and nervous, spoke rapidly, and was sweating profusely. This led Ramsey to suspect that Tate was under the influence of some type of drug. Officer Ramsey testified at the suppression hearing that, from his experience, Tate exhibited an abnormally high level of nervousness for someone stopped for a traffic violation.
¶ 8. Agent Greg Lea with the East Mississippi Drug Task Force testified at the suppression hearing that he and Agent Anthony Ball heard over the radio dispatch that Tate had been stopped for traffic violations. Agent Lea stated that the Task Force decided to respond to the stop to investigate because Lea had intelligence from confidential informants that Tate was presently using the truck to deliver marijuana. Agent Lea had a pending case against Tate for possession and delivery of a large amount of marijuana that had been hidden in the truck. And, Agent Lea knew that Tate recently had been caught with marijuana hidden on his person. Agent Ball radioed dispatch to advise the officer to look for signs of narcotics.
¶ 9. Task Force Agents Lea and Ball arrived at 2:27 p.m. At that time, Officer Ramsey was filling out Tate's tickets for the traffic violations while Tate sat inside his truck. Officer Ramsey informed the agents that he thought Tate was 1055-other, that something was not right, and that he had called Officer Payton since Tate appeared to be jumpy and nervous. The agents told Ramsey that Tate was known to traffic in drugs hidden inside compartments in the truck. At approximately 2:31 p.m., the police officers and Task Force agents approached the driver's side of the truck where Tate was sitting. Tate was positioned with his legs open, and Agent Lea observed an unusually large bulge in Tate's crotch area. Agent Lea noticed that Tate appeared nervous and that his hands were shaky.
¶ 10. Tate exited the truck. The officers asked if they could search the truck, but Tate did not consent to a search. The officers noticed Tate had a pocket knife on his belt and requested that he hand it over. Tate complied. Agent Lea asked Tate to turn around so that Officer Ramsey could search him for other weapons. Officer Ramsey told Tate that he was "not under arrest right now, I just want to make sure you don't have any weapons on you." Tate turned around with his back to Officer Ramsey.
¶ 11. Officer Ramsey was about to conduct a pat down search when Tate turned back around and "squared off at him" in a defensive manner as if he was not going to submit to the search. Then, Tate turned around again. Officer Ramsey placed Tate in a thumb-lock and began patting down Tate for weapons. Agent Lea watched the pat down. During the patdown, Officer Ramsey raised Tate's T-shirt above his waistband and felt around his waist. Officer Ramsey was in the midst of this when Agent Lea, standing in front of Tate, again observed the unusually large bulge in the area of Tate's crotch. Agent Lea stated, "what's that right there." Agent Lea testified that, due to Tate's *381 nervous behavior and Tate's defensive stance before the search, he was afraid that the bulge was a weapon. Lea asked Ramsey to handcuff Tate, stating that they had experienced problems with Tate in the past. Lea testified that he had wanted Tate handcuffed out of concern for the officers' safety.
¶ 12. With Tate handcuffed, Lea touched the bulge. Lea stated that, from palpating the bulge, he could feel stems and seeds and concluded from his experience that the bulge was a bag of marijuana. Tate stated that the bulge was his genitals. Lea stated, "I'm going to reach in here and get this bag of weed that you got. I just don't believe your [genitals are] that big, you understand?" Then, Lea reached into Tate's shorts and extracted a bag containing a substance that was determined to be 133.7 grams of marijuana.
¶ 13. The officers arrested Tate, searched him, and towed his truck to the Lauderdale County Detention Facility. At the facility, Tate was taken to be booked on the drug charge and given citations for speeding, no seat belt, and no liability insurance. The agents had a drug-sniffing dog walk around the outside of Tate's truck. The dog strongly alerted to the truck's cab, and the agents opened the cab. The agents found more marijuana under the seat of the truck and three Oxycodone tablets in the glove compartment.
I. THE COURT ERRED IN OVER-RULING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE.
¶ 14. Alleging an illegal search, Tate moved to suppress the evidence of the marijuana taken from his person and to suppress the drugs taken from his truck as the "fruit of the poisonous tree." Tate argued that his detention by Officer Ramsey exceeded the scope allowed under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Essentially, Tate contended that, at the time of the search, Officer Ramsey had improperly detained him beyond the scope of the original traffic stop in order to allow the Task Force agents to arrive. At the suppression hearing, the court heard testimony from Officer Ramsey and Agent Lea, and viewed a videotape from Officer Ramsey's patrol car showing the events before, during, and after Tate's arrest.
¶ 15. After the hearing, the trial court overruled the motion, finding that the detention of Tate was lawful. The court found that Tate had been detained by Officer Ramsey for sixteen minutes prior to the discovery of the marijuana during the pat down search. The court concluded that Tate's detention did not go beyond that reasonably necessary to determine whether Tate's driver's license was valid, whether there were any warrants for his arrest, and whether Tate was driving under the influence of narcotics. The court further found that Tate's behavior, his reaction to the stop, his possession of a pocket knife, and the suspicion that Tate was under the influence all reasonably warranted the search of Tate's person for weapons. The court found that, because the initial search of Tate's person was proper, the additional drugs from the truck could not be excluded as the fruit of the poisonous tree. Citing U.S. v. Dortch, 199 F.3d 193 (5th Cir.1999), the court further observed that the alert by a certified and trained narcotics dog established probable cause for the search of Tate's truck.
¶ 16. On appeal, Tate argues that the search of his person exceeded the scope of the weapons pat down allowed by Terry. He further argues that the evidence before the trial court showed that the incriminating nature of the object in *382 his shorts had not been readily apparent to Agent Lea through "plain feel." In reviewing the denial of a motion to suppress evidence, this Court will not disturb the lower court's findings unless the "'trial judge applied an incorrect legal standard, committed manifest error, or made a decision contrary to the overwhelming weight of the evidence.'" Taylor v. State, 733 So.2d 251, 255(¶ 18) (Miss.1999) (quoting Crawford v. State, 716 So.2d 1028, 1037(¶ 31) (Miss.1998)) (overruled on other grounds).
¶ 17. The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. v. Grant, 349 F.3d 192, 196 (5th Cir.2003). Traffic stops are considered to be seizures within the meaning of the Fourth Amendment. Id. Because a traffic stop more closely resembles an investigative detention than a formal arrest, this Court analyzes a traffic stop for Fourth Amendment purposes under the standard articulated in Terry. Couldery v. State, 890 So.2d 959, 962(¶ 8) (Miss.Ct.App.2004). Under Terry, a detention is lawful if the officer "can `point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the search and seizure].'" U.S. v. Santiago, 310 F.3d 336, 340 (5th Cir.2002). Terry requires "a two-tiered reasonable suspicion inquiry: 1) whether the officer's action was justified at its inception, and 2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place." Grant, 349 F.3d at 196. In determining the existence of "`reasonable suspicion, grounded in specific and articulable facts,' the court must consider whether, taking into account the totality of the circumstances, the detaining officers had a `particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Adams v. City of Booneville, 910 So.2d 720, 722(¶ 8) (Miss.Ct.App.2005) (quoting U.S. v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). During a lawful detention, an officer may legally frisk the suspect for weapons for the officer's protection, if the officer "has reason to believe that he is dealing with an armed and dangerous individual." Terry, 392 U.S. at 27, 88 S.Ct. 1868. The test for whether an officer acted legally in frisking a suspect is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id.
¶ 18. An officer proceeding upon reasonable suspicion may detain a suspect until such time at which reasonable suspicion has been verified or dispelled, at which point the detention must end. Grant, 349 F.3d at 196. If, during a proper investigative stop, the officer develops reasonable, articulable suspicion of some criminal activity in addition to than that initially suspected, the permissible scope of the stop expands to include the officer's investigation of the newly suspected criminal activity. U.S. v. Kye Soo Lee, 898 F.2d 1034, 1040 (5th Cir.1990). Thus, in Kye Soo Lee, an officer who legally stopped individuals for traffic violations was justified in further detaining the individuals when, within the legal scope of the traffic stop, the officer observed circumstances that created a reasonable suspicion of additional criminal activity. Id.
¶ 19. Tate does not contest the trial court's finding that the length of Tate's detention before the pat down search was within the scope allowed under Terry. Nonetheless, we briefly address that issue. Tate concedes that his initial stop for traffic violations was justified because he was speeding. Before the trial court, he argued that the justification for the stop ended prior to the pat down *383 search of his person and that the prolonged stop violated the Fourth Amendment.
¶ 20. We find that the trial court correctly concluded that the detention was legal. Officer Ramsey testified that, though he initially stopped Tate for speeding, his observance of Tate led him to suspect that Tate had been driving under the influence of a drug. Officer Ramsey was able to articulate specific facts about Tate's behavior that led him to suspect Tate had been driving under the influence of a drug. He had a reasonable suspicion Tate was intoxicated. Officer Ramsey was unwilling to further investigate Tate's suspicious behavior without backup due to the dispatcher's warning that Tate might sucker punch him. During the time before the arrival of the Task Force, Officer Ramsey filled out Tate's three traffic tickets while waiting upon Tate to produce valid proof of insurance and upon other officers to arrive to enable him to safely further investigate Tate's suspicious behavior. Officer Ramsey did not complete the tickets until after the pat down search, and he testified that fifteen minutes was not an inordinate amount of time for filling out three tickets. Thus, prior to the pat down search, Officer Ramsey had not completed his activities incident to the traffic stop nor allayed his reasonable suspicion that Tate had been driving under the influence of a drug.
¶ 21. Thus, when the Task Force arrived, Tate was being legally detained by Officer Ramsey. The evidence before the trial court was undisputed that Officer Ramsey did not call the Task Force to assist his investigation of the suspicious circumstances that he witnessed. Rather, the Task Force responded to the scene based on the suspicion of Agents Lea and Ball that Tate was using the refrigerated truck to deliver marijuana. Agent Lea articulated specific facts that undergirded this suspicion, namely, that they had intelligence from confidential informants that Tate was presently using the truck for marijuana deliveries and that Tate recently had been apprehended by the Task Force with marijuana hidden in the truck. We need not reach the question of whether this suspicion was reasonable under Terry such that the task force could have detained Tate independently of Officer Ramsey. This is because, prior to the pat down, Officer Ramsey had reasonable suspicion that Tate was under the influence of drugs and had not finished writing the traffic tickets at the time that the pat down search was conducted. Therefore, Tate was being legally detained at the time of the pat down search.
¶ 22. We proceed to Tate's argument that the search of his person exceeded the permissible scope of a weapons pat down. The purpose of the limited search for weapons allowed under Terry "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." Minnesota v. Dickerson, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (quoting Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). This protective search must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." Id. (quoting Terry, 392 U.S. at 26, 88 S.Ct. 1868.) If a protective search exceeds what is necessary to ascertain whether the suspect is armed, the search is invalid and its fruits must be suppressed. Id.
¶ 23. Tate contends that, at the time the marijuana was discovered, Officer Ramsey and Agent Lea had exceeded the scope of a protective search for weapons and were undertaking an exploratory search of his body for contraband. We find that the trial court correctly held that *384 the search of Tate did not exceed the limits of a protective search. Officer Ramsey testified that he had not completed his weapons pat down but was in the midst of it at the time that Agent Lea noticed the bulge in Tate's shorts. This testimony was supported by the videotape of Tate's detention. Agent Lea testified that the bulge was unusually large and that, given Tate's erratic behavior, defensive posturing, and possession of a pocket knife, he believed that the bulge could be a weapon. Therefore, at the time Agent Lea proceeded to pat the bulge, the officers had not extended their search of Tate beyond what was necessary to determine whether he was armed and dangerous.
¶ 24. Tate further argues that the evidence before the trial court showed that the incriminating nature of the object in his shorts had not been readily apparent to Agent Lea through "plain feel." This Court discussed the "plain feel" exception to the warrant requirement in Edwards v. State, 795 So.2d 554, 561-62 (¶¶ 29-30) (Miss.Ct.App.2001). The Court quoted from the supreme court's holding in Dickerson that, when an officer, during a lawful pat down search, "feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." Id. (quoting Dickerson, 508 U.S. at 375-76, 113 S.Ct. 2130). Accordingly, "if the object is contraband, its warrantless seizure would be justified." Id. While an officer may extract a weapon during a pat down search based on reasonable suspicion, the "plain feel" exception to the warrant requirement for the discovery of contraband during a pat down search requires that the officer have probable cause to believe that the object is contraband. Id. at 562(¶ 30). "Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which [he] had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Walker v. State, 881 So.2d 820, 827(¶ 15) (Miss.2004).
¶ 25. From the testimony before the trial court, we find that the court properly found that Agent Lea obtained a plain enough feel to establish probable cause to believe that the bulge in Tate's shorts was marijuana. Agent Lea stated that, when he touched the bulge, he could feel stems and seeds through the fabric of Tate's shorts that he thought was marijuana. Agent Lea stated that the stems and seeds felt like marijuana to him based upon his six years of experience as a narcotics agent. The testimony established that it was immediately apparent to Agent Lea that the bulge was, in fact, marijuana. Therefore, Agent Lea had the requisite probable cause to enable him to reach into Tate's shorts and remove the bag. We affirm the trial court's denial of Tate's motion to suppress the marijuana found in his shorts and the evidence collected thereafter.
II. THE COURT ERRED IN ALLOWING INTO EVIDENCE PRIOR FELONY CONVICTIONS OF THE DEFENDANT.
¶ 26. Tate had at least four prior convictions. Two of these convictions were for felony sale of marijuana, less than one ounce, and were from January 28, 1991, in Lauderdale County Circuit Court. Two other convictions were for delivery of marijuana and possession of marijuana with intent to distribute and were from November 7, 2003, also in Lauderdale County Circuit Court. Tate objected to the introduction of these convictions.
*385 ¶ 27. The trial court, after conducting a balancing analysis pursuant to Mississippi Rule of Evidence 403, allowed some of the convictions into evidence under M.R.E. 404(b) for the purpose of showing intent. The court also announced that it would give a limiting instruction on the purpose of the admission of the prior convictions. Tate contends that it was error for the trial court to allow the admission of some of his prior convictions.
¶ 28. This Court reviews the trial court's decision admitting or excluding evidence for abuse of discretion. McGowen v. State, 859 So.2d 320, 328(¶ 26) (Miss. 2003). Collins v. State, 734 So.2d 247, 250 (Miss.Ct.App.1999), recognized that "M.R.E. 404 provides that evidence of a prior conviction or other bad act may be probative of knowledge or intent, even though a prior conviction is not admissible to show a person committed the offense again." Exhibit # 11, which was admitted into evidence, only included the sentencing orders from 2003. There is no indication that the 1991 convictions were admitted into evidence. There is no indication that the jury was made aware of the earlier convictions other than a brief reference in closing argument that "from 1990, Kirby Tate has demonstrated that he sells marijuana."
¶ 29. Tate argues that under M.R.E. 609(b), the convictions in January 1991 were too remote and should have been excluded. Rule 609(b) excludes evidence of a conviction "if a period of more than ten years has elapsed since the date of the conviction. . . ." However, Tate's convictions were not admitted pursuant to M.R.E. 609. Tate admits that there is no time limit barring evidence from being admitted pursuant to M.R.E. 404(b). Thus, even if the 1991 convictions had been admitted, the admission was not an abuse of discretion. This issue is without merit.
III. THE PROSECUTOR COMMITTED ERROR IN MAKING THE "SEND THE MESSAGE" ARGUMENT.
¶ 30. Tate argues that the trial court erred in allowing the following language in the prosecution's closing argument:
Now, what message do you send, ladies and gentlemen, to law enforcement officers if you say, Now, when you'rewhen you're out there being paid to enforce the narcotics law and you get a call or you hear a call where a known drug violator, a known dealer who is currently out on bond for dealing drugs is coming through and has been stopped, and you's got intelligenceyou know thatinformants have told you that he's still transporting drugs while he is out on bond on the other charge, and know he's got prior convictions for dealingthere you are. You hear that information, and what do you do? You sit and continue surveillance like these two lawyers want them to? They want them to sit wherever it was they were on the off chance that maybe somebody will walk by smoking a joint? No, if you were their supervisor, you'd say, Hit the door. You don't work here because you're not doing your job. What you want that officer to do is to go there. You want those officers to try to actively enforce the drug laws. They didn't do anything wrong. Now, according to the Defense Lawyers, they did; but remember Lisa told you, their loyalty is to that man (indicating). They'll do anything they can to try to get you to let him go.
¶ 31. Tate made no contemporaneous objection to this language in the closing argument even though Tate was represented by two defense attorneys at his trial. "It is well settled that to preserve an objection to alleged improper remarks *386 by counsel during closing argument, the complaining party must not only make a contemporaneous and specific objection to the remarks, but must also obtain a definitive ruling from the trial court on his objection and must request corrective action." Rials v. Duckworth, 822 So.2d 283, 287(¶ 22) (Miss.2002). Because Tate failed to make a timely objection, the issue is procedurally barred. Payton v. State, 785 So.2d 267, 270(¶ 10) (Miss.1999).
IV. THE COURT SENTENCE OF SIXTY YEARS WITHOUT PAROLE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT VIOLATIVE OF THE UNITED STATES CONSTITUTION AND CONSTITUTION OF THE STATE OF MISSISSIPPI.
¶ 32. At sentencing, Tate raised a constitutional objection to the length of his sentence. The trial court stated that it was sentencing Tate as a prior felony controlled substance violator under Mississippi Code Annotated section 41-29-147 (Rev. 2005), which provides for a sentence of double the maximum time. The trial court also stated that Mississippi Code Annotated section 99-19-81 (Rev.2000) required that Tate be sentenced as a habitual offender. Tate acknowledges that his sentence was within the limits prescribed by statute, but argues that his sentences violates the United States and Mississippi Constitutions' prohibitions against cruel and unusual punishment. Tate argues that his sentence of sixty years is grossly disproportionate to his crime and that the trial court erred by failing to evaluate his sentence under the proportionality analysis articulated in Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).
¶ 33. As a general rule, a sentence that does not exceed the statutory maximum for the crime will not be disturbed on appeal. Nichols v. State, 826 So.2d 1288, 1290(¶ 10) (Miss.2002). But, when a threshold comparison of the crime to the sentence leads to an inference of "gross disproportionality," the reviewing court will conduct a proportionality analysis using three factors from Solem. Hoops v. State, 681 So.2d 521, 538 (Miss.1996). These factors include: (1) the gravity of the offense and the harshness of the penalty; (2) a comparison with the sentences imposed on other criminals in the same jurisdiction; and (3) a comparison with the sentences imposed for commission of the same crime in other jurisdictions. Solem, 463 U.S. at 291-92.
¶ 34. Tate contends that a threshold comparison of his crime with his sentence should have triggered an inference of gross disproportionality, mandating the application of the Solem factors to his sentencing. We observe that the Mississippi Supreme Court has recently affirmed Tate's sixty-year sentence as a prior felony controlled substance violator and habitual offender for possession and delivery of marijuana. Tate, 912 So.2d at (¶ 53). In so doing, the court found that Tate's sentence was not grossly disproportionate to his crime. The court relied upon the case of Williams v. State, 794 So.2d 181 (Miss. 2001). In Williams, the defendant received a 120 year sentence without the possibility of parole or early release for sale of cocaine. Williams, 794 So.2d at 189(¶ 36). This sentence was the result of the application of enhanced sentencing to Williams's offense. Williams was sentenced to thirty years under section 49-29-132, but had sold the cocaine near a school, resulting in the doubling of his sentence to sixty years. Id. Since Williams was a second and subsequent offender under section 41-29-147, his sentence was again doubled to 120 years. Id. Williams was further sentenced without *387 the possibility of parole or early release as a habitual offender pursuant to section 99-19-81. Id. The court held that this sentence was not grossly disproportionate to the crime. Id. at 190(¶ 39). While Tate's sixty-year sentence for possession of marijuana is certainly harsh, in light of the holdings of Tate and Williams, we find that his sentence was not grossly disproportionate to his crime.
¶ 35. THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY OF CONVICTION OF COUNT I, POSSESSION OF MARIJUANA OF APPROXIMATELY 289.8 GRAMS AND SENTENCE OF SIXTY YEARS AND FINE OF $5,000, AND CONVICTION OF COUNT II, POSSESSION OF OXYCODONE AND SENTENCE OF SIXTEEN YEARS AND FINE OF $5,000, EACH SENTENCE WITHOUT PROBATION, PAROLE OR EARLY RELEASE OR GOOD TIME, THE SENTENCES TO RUN CONCURRENTLY TO EACH OTHER AND CONCURRENTLY TO TIME IN CAUSE # 298-03 ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. ROBERTS, J., NOT PARTICIPATING.